IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 15, 2003

## STATE OF TENNESSEE v. PHILLIP HOWARD WHITE, JR.

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-C-1729     Cheryl Blackburn, Judge**

**No. M2001-03109-CCA-R3-CD - Filed May 2, 2003**

Defendant, Phillip Howard White, Jr., was indicted on one count of felony murder and one count of attempted especially aggravated robbery. Following a jury trial, Defendant was found guilty of second degree murder and not guilty of attempted especially aggravated robbery. After a sentencing hearing, the trial court sentenced Defendant to serve twenty-five years. In his appeal, Defendant alleges that (1) the evidence was insufficient to sustain his conviction; (2) the trial court erred in not instructing the jury to refrain from sleeping; (3) the trial court erred in not granting Defendant's request for a continuance because of Defendant's physical appearance at trial; and (4) the trial court erred in sentencing Defendant to twenty-five years. After a careful review of the record in this matter, we affirm the judgment of the trial court.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Thomas T. Overton, Nashville, Tennessee, for the appellant, Phillip Howard White, Jr.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Jim Todd, Assistant District Attorney General; and Roger Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

**1. Evidence at Trial**

Jean Joseph, Deandre Spencer, and Lazurus Sweeney each testified about the events occurring on September 10, 1999 which led to Defendant's conviction. Although the testimony varied as to the specific details of the events occurring between the time Defendant joined the group and the killing of the victim, the young men agreed on the following general overview of that afternoon's activities.

Mr. Joseph, Mr. Spencer and Mr. Sweeney attended the same school and had become acquainted with each other when classes started in August. On September 10, the young men left school together in Mr. Joseph's car. Mr. Sweeney asked Mr. Joseph, the driver, to take him to his sister's house in the Westchester area so that Mr. Sweeney could retrieve a spare house key. Defendant came up and started talking to Mr. Sweeney while they were at his sister's house. Eventually, Defendant joined the young men in the car, and the group drove back to West Nashville. Mr. Joseph needed to stop by United Imports so that he could give Mr. Gholam Soheilinia, the owner of the business, a payment on his car note. Mr. Soheilinia was known to his employees and Mr. Joseph as Mr. Ali. While the young men were at the car lot, Defendant attempted to rob Mr. Ali. When Mr. Ali resisted, Defendant shot the victim in the abdomen. Defendant fled the premises while Mr. Joseph, Mr. Sweeney and Mr. Spencer stayed at the car lot, eventually making statements to the police. Later that evening after surgery, Mr. Ali died of the gunshot wound.

Mr. Sweeney testified that he had just turned sixteen when the offense occurred. As they drove around that afternoon, the young men discussed how to get enough money to go to the state fair. Mr. Sweeney said that Mr. Joseph first suggested going to United Imports because he needed to make a car payment. The group asked Mr. Joseph about Mr. Ali, and Mr. Joseph told them that Mr. Ali kept cash in the front pocket of his trousers. Defendant then said that he would rob Mr. Ali. Two or three days earlier, Mr. Sweeney had bought a revolver for Mr. Joseph who said he was having trouble with some of the people in his neighborhood. Mr. Joseph had the revolver in the car's glove compartment and handed it to Defendant before they arrived at United Imports.

Mr. Sweeney said that he and Mr. Spencer were supposed to go to the car lot first to see how many people were on the premises and where they were located, then report back to Mr. Joseph and Defendant. Then, Mr. Joseph would enter the office to make his car payment, and Defendant would follow him in a few minutes. Mr. Joseph would act like a victim, too, and Defendant would rob both Mr. Ali and Mr. Joseph.

Once Mr. Sweeney arrived at the car lot, however, he spotted a Camero and decided to steal the car instead of helping Defendant and Mr. Joseph with the robbery. Mr. Amaya, an employee of United Imports, brought Mr. Sweeney the key to the car so that Mr. Sweeney could listen to the car's engine, and Mr. Sweeney and Mr. Spencer got in the Camero. Mr. Sweeney planned to drive off the lot as soon as he started the car, but the car did not have a battery. Mr. Spencer and Mr. Sweeney were still sitting in the Camero when Mr. Sweeney spotted Defendant and Mr. Joseph entering Mr. Ali's office in the car's rear view mirror. He heard sounds of a scuffle, then, through the office window, saw Mr. Ali throw a book at Defendant. Mr. Sweeney heard one gunshot, and Defendant came out of the office building carrying a .32 revolver. Defendant ran down the street while Mr. Joseph stayed in the building. On cross-examination, however, Mr. Sweeney testified that Mr. Joseph left the car lot with Defendant but drove back in his car to United Imports in a few minutes. Mr. Sweeney said that Mr. Joseph called the 911 operator on his cell phone and reported the shooting. Mr. Sweeney also said that Defendant was wearing a black shirt, blue jean shorts and black tennis shoes that afternoon. Mr. Joseph had lent Defendant the tennis shoes before they arrived at United Imports.

In October, Mr. Sweeney's sister told him that Defendant had told other people that Mr. Sweeney had committed the robbery. Mr. Sweeney was afraid Defendant would harm his sister if he discovered that she had told Mr. Sweeney about the rumors. Mr. Sweeney contacted Crime Stoppers and described the events of September 10. Mr. Sweeney was also ultimately charged with felony murder and attempted especially aggravated robbery but was not tried with Defendant.

Mr. Spencer, also sixteen at the time of the shooting, said that he had not met Defendant until that afternoon but he knew the other two young men. As they were driving, Mr. Joseph handed a revolver to Mr. Sweeney who in turn handed the gun to Defendant. Later, while he and Mr. Sweeney were sitting in the Camero, Mr. Spencer saw Mr. Joseph go into Mr. Ali's office, and Defendant followed him into the building about ten minutes later. Mr. Spencer heard noises from the office, saw Mr. Ali throw something, and then saw Defendant shoot Mr. Ali once. Defendant ran out of the office and down the street. Mr. Amaya chased Defendant as far as the street corner where Defendant stopped and pointed the revolver at Mr. Amaya. Mr. Amaya ducked behind a car. Mr. Spencer said that he thought Mr. Joseph had left the office before Defendant arrived and returned to the car lot after the shooting. Mr. Spencer was not charged in connection with the offense.

Mr. Joseph, the co-defendant at Defendant's trial, said that he was born in Limbe, Haiti and came to the United States when he was thirteen or fourteen years old. When Mr. Joseph first arrived in this country, he did not speak English. Mr. Joseph first met Mr. Spencer and Mr. Sweeney at school but only knew them by their nicknames. He met Defendant the day of the shooting when Mr. Sweeney invited Defendant to drive around with them while they were at Mr. Sweeney's house.

On September 10, Mr. Joseph's mother had given him $220 to pay his car note at United Imports and the water bill. The rest was for spending money. Mr. Joseph often gave Mr. Sweeney and Mr. Spencer a ride home from school, and, that afternoon, Mr. Sweeney asked Mr. Joseph to take him to his sister's house. When they arrived, Mr. Sweeney talked to Defendant who was already at the house and brought him back to the car. Mr. Joseph thought he was Mr. Sweeney's friend and was going to Mr. Sweeney's house. Mr. Joseph did not learn Defendant's name until the time of the trial. As they drove, Defendant and Mr. Sweeney began talking about their lack of money, and Mr. Joseph was scared they would take his money so he kept driving. Mr. Joseph could not always understand what the others were saying, especially the slang phrases. At some point during the ride, Mr. Joseph noticed the gun for the first time

As it grew later, Mr. Joseph said that he had to go to United Imports to pay his car note because he had to be at work by 6:00 p.m. Defendant and Mr. Sweeney asked him about Mr. Ali, and Mr. Joseph responded that Mr. Ali carried money with him because he sold cars. When he paid his car note, Mr. Joseph told them that Mr. Ali always put the money in his pocket. Mr. Joseph said that he did not really hear what the others were discussing and thought that Mr. Sweeney wanted to look at cars when they got to United Imports. In the past, Mr. Joseph had received money from Mr. Ali when he brought in a customer who decided to buy a car.

When Mr. Joseph arrived at United Imports, he could not pull directly into the car lot because other cars were coming out of the gate. He drove back to the Mapco gas station, and Mr. Sweeney and Mr. Spencer got out. Defendant stayed in the car and told Mr. Joseph to drive a little further and drop him off. When Defendant left the car, he had the gun with him. Mr. Joseph drove around the block and when he reached the car lot again a customer was pulling out. Mr. Joseph parked his car in the empty space inside the gate.

Mr. Joseph said there were a lot of people in the car lot, most of whom he knew. He waved at Mr. Sweeney and Mr. Spencer who were standing next to a car with Mr. Amaya. He did not see Defendant. Mr. Joseph went inside the garage and handed his car payment to Mr. Ali. He told him that Mr. Sweeney might want to buy a car, and Mr. Ali told him to keep bringing people into the business. A few people wandered through the office, then Mr. Ali and Mr. Joseph were alone. As Mr. Ali started to write out Mr. Joseph's receipt, Defendant entered the office through the door behind Mr. Joseph. From his position in the room, Mr. Joseph could not see Defendant's full profile. Defendant told Mr. Ali he wanted to see a car, and Mr. Ali sent him outside to find someone to help him. Mr. Joseph told Mr. Ali that the boy looked like the boy who had been in his car. Mr. Joseph was scared and started to tell Mr. Ali about the gun. In a few seconds, though, Defendant returned to the office and said something to Mr. Ali that Mr. Joseph could not understand. He did not think Defendant was speaking English. Mr. Ali laughed at Defendant and threw a book at him. Mr. Joseph saw the gun and ran outside, shouting that there was a fight in the office. Mr. Joseph and the others who gathered outside the office saw Mr. Ali throw more objects at Defendant. Mr. Joseph got in his car and then heard a gunshot. He saw Defendant leave the building from his rearview mirror and heard Mr. Ali call out for help. As Mr. Joseph returned to the office, he saw Mr. Amaya run after Defendant. Mr. Joseph called the 911 operator on his cell phone because the telephone in Mr. Ali's office did not work. When the emergency vehicles arrived, Mr. Joseph moved his car to the Mapco station.

Mr. Joseph gave a description of the perpetrator to the police that matched Defendant's appearance but did not tell him that he thought the perpetrator was the same person who had been in his car earlier. Mr. Joseph was not completely sure that the young man who shot Mr. Ali and the youth who rode with him was the same person. After Mr. Joseph gave his statement to the police, he took Mr. Sweeney and Mr. Spencer home. As they drove, Mr. Sweeney told Mr. Joseph that Defendant was not the man who shot Mr. Ali.

During a second interview with the police, Mr. Joseph still did not disclose Defendant's identity. Some time later, Mr. Joseph drove Mr. Sweeney back out to the Westchester area hoping to see Defendant again and confirm whether or not he was the one who shot Mr. Ali. Defendant was not there, however, and Mr. Joseph did not see Defendant again until the trial.

After Mr. Sweeney revealed the young men's names to Crime Stoppers, Mr. Joseph, along with Mr. Spencer and his family, met with Detective Bernard at Juvenile Court to confirm Defendant's identification as the perpetrator. While he was there, Mr. Joseph was arrested.

Officer Paul Junkmann responded to the call concerning the shooting at United Imports. When he arrived on the scene, Officer Junkmann found Mr. Ali on the floor of his office, bleeding from a gunshot wound to the abdomen. Mr. Joseph and Mr. Sweeney told Officer Junkmann that they were at United Imports to purchase a car and had seen the shooting. The young men gave Officer Junkmann a description of Defendant and the direction he had fled but did not tell Officer Junkmann Defendant's name or that they had come to United Imports with Defendant. Officer Junkmann noticed that the office telephone was off the hook but did not see any cash or a money box. Although he searched the immediate area, Officer Junkmann did not find any shell casings or a weapon.

Officer Gerald McShepard also interviewed Mr. Joseph and Mr. Sweeney. He said that Mr. Joseph's interview was difficult because Mr. Joseph had trouble communicating in English. Officer McShepard, however, did not request the assistance of an interpreter.

Officer Steve Sloan dusted the office space and door for fingerprints but did not locate any usable prints. He, too, could not find any shell casings or bullet strikes on the floor or the wall. The only physical evidence at the scene was the victim's shirt and blood.

Selvyn Amaya Garcia, known as Mr. Amaya, testified through an interpreter at trial. Mr. Amaya said that he arrived at United Imports around noon on September 10 to paint Mr. Ali's office. Later that afternoon, Mr. Ali asked Mr. Amaya to show a car to two young men. Mr. Amaya did not see either Mr. Joseph or Defendant enter the car lot. He knew Mr. Joseph, however, because he had seen him before when Mr. Joseph came in to make a car payment. While Mr. Amaya was showing Mr. Spencer and Mr. Sweeney the car, he noticed Mr. Joseph standing outside the office looking scared. Mr. Amaya then heard Mr. Ali shout from the office that he had been shot. Mr. Amaya saw Defendant exit the building with a gun in his hand. Defendant pointed the gun at Mr. Amaya and said something which was unintelligible to Mr. Amaya. Mr. Amaya thought the words sounded like a foreign language. Defendant then put the weapon in his pants and ran out of the car lot. Mr. Amaya chased Defendant down the street until they reached the corner, and then Mr. Amaya returned to United Imports. Mr. Amaya was able to see Defendant's face for approximately fifteen seconds although for one or two of those seconds, Mr. Amaya's attention was focused on the gun.

When Mr. Amaya returned to the office, he saw Mr. Joseph, Carlos Ajuilar, another man also named Carlos Ajuilar, and Carlos Sarriea. Mr. Amaya called the 911 operator at Mr. Ali's request, then left the receiver off the hook. On October 22, 1999, Mr. Amaya identified Defendant as the perpetrator from a photo line-up and also identified Defendant in court as the man with the gun.

The two men named Carlos Ajuilar testified through an interpreter that they were working in the garage when they heard the gun shot. The first Mr. Ajuilar rushed to the office's side door, his helper behind him. When he saw Mr. Ali on the floor, he closed the door again and went back to the garage. The second Mr. Ajuilar entered the office through the front door after he heard one gunshot. Mr. Amaya was already there trying to assist Mr. Ali. Both men only caught a glimpse of a man running away.

Mr. Carlos Sarriea was also painting Mr. Ali's office on September 10.  Later in the afternoon, Mr. Ali asked Mr. Sarriea to bring him a soda from the Mapco store.  Mr. Sarriea was gone approximately five minutes and when he returned, he discovered Mr. Ali on the floor.  He said that the only person in the office at that point was Mr. Joseph.

Mr. Tommy Heflin with the Tennessee Bureau of Identification testified that the bullet retrieved from Mr. Ali's body was a .32 caliber bullet.

Detectives Al Gray and E. J. Bernard investigated the shooting.  Detective Gray showed a photo line-up containing Defendant's picture to Mr. Joseph, Mr. Spencer and Mr. Amaya.  All three identified Defendant as the perpetrator.  Detective Bernard interviewed Mr. Sweeney initially and felt that he was not telling the truth.  On a second interview, Mr. Sweeney described his role in the offense to Detective Bernard.  Both detectives testified that Mr. Joseph initially told them that the perpetrator was an African with scars on his face and six and one-half feet tall.  Mr. Joseph denied making these statements.

Mrs. Marie Joseph confirmed that she had given Mr. Joseph $150 for his car payment, $50 for the water bill, and $20 for spending money on the morning of September 10.  Mrs. Joseph also said that her son had access to the family bank account which at the time of the offense contained approximately $8,000.  Mr. Jean Baptiste Joseph, Mr. Joseph's father, confirmed the existence of the joint bank account and said that his son had worked since he was fifteen or sixteen.  Mr. Hermamise Prophete, a friend of the family's, and Mr. Reginald Pierre, the leader of the Haitian Community Association, also testified that Mr. Joseph had worked since he was fifteen.

On the basis of the proof offered at trial, the jury acquitted Defendant of first degree felony murder and attempted especially aggravated robbery and found Defendant guilty of second degree murder.  The jury acquitted Mr. Joseph on both charges.

## 2.  Sufficiency of the Evidence

Defendant argues that the only evidence identifying him as the perpetrator came from Mr. Amaya who admitted that he only saw Defendant's face for about fifteen seconds.  Further, Mr. Amaya testified that his attention was focused on the gun for one or two those seconds.  Mr. Amaya testified that he could not understand what Defendant said as he emerged from Mr. Ali's office but that the words sounded like a foreign language.  Defendant asserts that the State did not present any evidence at trial indicating that Defendant knew any language other than English.  Although Defendant concedes that the other three young men in the group identified Defendant as the one who shot Mr. Ali, Defendant contends that their testimony is not credible because of the inconsistencies and various lies told by each young man on different occasions.

While an accused may challenge the sufficiency of the evidence, questions concerning witness credibility, the weight and value to be accorded the evidence as well as all factual issues are left to the trier of fact.  *State v. Tuttle,* 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995).  This court

will not reweigh or reevaluate the evidence presented at trial. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Moreover, the State is entitled to the strongest legitimate view of the evidence as well as all inferences which may be drawn therefrom. *Id.* In challenges to the sufficiency of evidence, therefore, this court's standard of review is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt when reviewing the evidence "in the light most favorable to the prosecution." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). A guilty verdict removes an accused's presumption of innocence and replaces it with a presumption of guilt. *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982). Accordingly, Defendant has the burden of demonstrating how the evidence is insufficient to support the verdict returned by the trier of fact. *Id.*

A conviction may not be based solely on the uncorroborated testimony of an accomplice. *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001). Nor can accomplices corroborate each another. *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995). The corroborating testimony must include some fact that establishes the defendant's identity and leads to the inference that a crime has been committed in which the defendant is implicated. *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992) quoting *Hawkins v. State*, 4 Tenn. Crim. App. 121, 469 S.W.2d 515 (1971); *see also State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). However, only a modicum of evidence is required to corroborate the testimony of an accomplice, and the corroborating evidence need not, standing alone, sustain a conviction. *State v. Copeland*, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984); *Gaylor*, 862 S.W.2d at 552.

As Defendant points out, the testimony of Mr. Spencer, Mr. Sweeney and Mr. Joseph presented three different versions of the young men's activities on September 10. However, these discrepancies as well as the inconsistencies in the young men's subsequent statements to the police were issues properly placed before the jury whose province it was to determine the weight accorded the testimony of each witness. Despite the inconsistencies, however, all three young men testified that Defendant was in possession of the gun, and that Defendant entered Mr. Ali's office. All three testified that they heard a gunshot, and then Defendant exited the office building with the gun in his hand.

Moreover, Mr. Amaya's testimony corroborates Mr. Spencer's, Mr. Sweeney's and Mr. Joseph's testimony that Defendant was the perpetrator. Mr. Amaya testified that he was standing approximately twenty feet from the office building when he saw Defendant exit Mr. Ali's office with a gun in his hand. Defendant briefly pointed the gun at Mr. Amaya, then ran down the street. Mr. Amaya pursued Defendant until they reached the street corner. Mr. Amaya identified Defendant as the perpetrator from a line-up of six photographs as well as in the courtroom. Mr. Amaya admitted that he did not understand what Defendant said as he left the premises, but Mr. Amaya was not the only witness in this matter who had difficulties comprehending English. Any doubt as to the credibility or inconsistency of Mr. Amaya's testimony was resolved by the jury.

Based upon a review of the record, we conclude that the evidence was sufficient to sustain Defendant's conviction. Defendant is not entitled to relief on this issue.

### 3. Inattentive Juror

Defendant alleges that he was denied a fair trial because one of the jurors became drowsy during Mr. Amaya's testimony. Because Mr. Amaya was an eyewitness to the crime, Defendant contends that he was prejudiced when one of the jurors missed a portion of this critical testimony.

Mr. Amaya was the last witness before the trial court recessed for lunch at 12:20 p.m. After the jury was excused, Defendant's counsel told the trial court that one of the jurors was having trouble staying awake. The trial court felt that the midday break would help alleviate the juror's drowsiness and assured counsel that it would be attuned to any further signs of inattention. Defendant did not raise any further issues concerning the attentiveness of the jury, and the record does not indicate that any more problems with drowsiness were encountered.

"The mere fact that a juror became drowsy for a short time is not of itself ground for a new trial" without a showing of prejudice. *State v. Chestnut*, 643 S.W.2d 343, 346 (Tenn. Crim. App. 1982). The various factors important in determining whether Defendant was prejudiced include the length of time the juror was inattentive and the importance of the evidence being presented at that time. *Id.* The record does not indicate how long the drowsiness lasted or at what point in Mr. Amaya's testimony the juror appeared to have difficulties staying awake. The record does not indicate that this was a continuing problem. Moreover, Mr. Amaya's testimony was resumed after the lunch recess during which he testified that Defendant's words sounded like a foreign language to him. Defendant relied on this piece of evidence to argue that Mr. Amaya was mistaken in his identification of Defendant as the perpetrator, and the record does not indicate that the juror was inattentive at this point.

Defendant did not move to offer proof at trial that any members of the jury were drowsy or request that the trial court take any remedial measures such as questioning the jurors as to their inattentiveness or ability to stay awake. Defendant did not request a mistrial on the basis of the inattentive jurors, or an instruction to the jury that they should remain alert and inform the court if a break was needed, or that an alternative juror replace the drowsy juror. Accordingly, we find that Defendant has not shown that he was prejudiced by the trial court's failure to take any further action on this issue.

### 4. Defendant's Motion for Continuance

During the weekend preceding the trial, Defendant was apparently involved in an altercation with the sheriff's deputies which resulted in Defendant sustaining two black eyes and swelling around his face. On Monday morning, Defendant asked for a continuance until his face healed contending that his injuries made him look like a criminal. The trial judge said that Defendant's black eyes were not visibly apparent from her position in the courtroom and his face merely showed some swelling. After ascertaining that Defendant was not on any medication that would impair his ability to understand the proceedings, the trial court denied Defendant's request. Defendant now challenges the trial court's denial of his motion for a continuance and argues that his appearance unfairly prejudiced him in the eyes of the jury and compromised his right to a fair trial.

The granting or denial of a continuance is a matter left to the sole discretion of the trial judge, whose decision will not be disturbed absent a showing of abuse of discretion to the defendant's prejudice. *State v. Hurley*, 876 S.W.2d 57, 65 (Tenn. 1993); *State v. Russell*, 10 S.W.3d 270, 275 (Tenn. Crim. App. 1999). This court has previously stated that "[t]he only test is whether the defendant has been deprived of his rights and an injustice done." *State v. Goodman*, 643 S.W.2d 375, 378 (Tenn. Crim. App. 1982). In order to reverse the judgment of the trial judge, we must be convinced that the defendant "did not have a fair trial and that a different result would or might reasonably have been reached had there been a different disposition of the application for a continuance." *Baxter v. State*, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973); *see also Hurley*, 876 S.W.2d at 65; *State v. Caughron*, 855 S.W.2d 526, 534 (Tenn. 1993).

Implicit in an accused's right to a fair trial is a presumption of innocence which is physically manifested both through the defendant's appearance and the court's environment. *Willocks v. State*, 546 S.W.2d 819 (Tenn. Crim. App. 1976)(quoting *Kennedy v. Cardwell*, 487 F.2d 101, 104 (6th Cir. 1973)); *Estelle v. Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 1692, 48 L. Ed. 2d 126 (1976). The accused is entitled to have his guilt or innocence determined only on the basis on the evidence introduced at trial. *Holbrook v. Flynn*, 475 U.S. 560, 567, 106 S. Ct. 1340, 1345, 89 L. Ed. 2d 525 (1986) quoting *Taylor v. Kentucky*, 436 U.S. 478, 485, 98 S. Ct. 1930, 1935, 56 L. Ed. 2d 468 (1978). An accused's physical appearance, therefore, may be inherently prejudicial if it serves as a "constant reminder of the accused's condition" or causes "a significant effect on the jury's feelings about the defendant." *Id.* at 568-569, 106 S. Ct. at 1345-1346 (quoting, in part, *Estelle*, 425 U.S. at 504-505, 96 S. Ct. at 1693).

Our initial inquiry, therefore, is whether the bruising on Defendant's face was inherently prejudicial so that the "fairness of the factfinding process" was seriously threatened. *Id.* In *Willocks*, this court concluded that the trial court abused its discretion when it permitted the shackling of the accused during trial without a clear showing of necessity. *Willocks*, 546 S.W.2d at 822. We also concluded that an accused should not be forced to attend his or trial attired in prison garb if the accused requests permission to dress in civilian clothes. *Carroll v. State*, 532 S.W.2d 934 (Tenn. Crim. App. 1975); *See also Estelle*, 426 U.S. at 504, 96 S. Ct. at 1695; *State v. Baker*, 751 S.W.2d 154 (Tenn. Crim. App. 1987). Wearing either shackles or prison dress is a constant and continuing reminder to the jury that the accused is in custody, and such items represent "unmistakable indications of the need to separate a defendant from the community at large." *Estelle*, 475 U.S. at 569, 106 S. Ct. at 1346.

We do not believe, however, that Defendant's bruises were inherently prejudicial. The trial judge said that she could not tell that Defendant's eyes were blackened and noticed only a little swelling around his face. Defendant was not dressed in prison clothes, but in a tee-shirt and black pants as shown in the photographs taken on the first day of trial. He also was not shackled, nor is there any mention in the record that additional security was added to the courtroom because of the altercation. In short, Defendant's injuries were not directly connected to his status as a defendant in the case. What inferences, if any, the jury drew from Defendant's bruises could have been based on any number of suppositions. For all the jury knew, Defendant sustained his bruises in a fight at

his home or in a car wreck, or from any number of causes. *See Holbrook*, 475 U.S. at 569, 106 S. Ct. at 1346 (The chief distinguishing factor in not concluding that an increased number of security officers is inherently prejudicial is "the wider range of inferences that a juror might draw from the officers' presence."). *See also State v. Sutton*, 761 S.W.2d 763 (Tenn. 1988); *State v. Fuqua*, C.C.A. No. 1178, 1991 WL 165195 (Tenn. Crim. App., Knoxville, August 28, 1991)(Denying the defendant's request to wear his Navy uniform at trial was not inherently prejudicial) *State v. Beauregard*, No. W1999-01496-CCA-R3-CD, 2000 WL 705978 (Tenn. Crim. App., Jackson, May 26, 2000)(Defendant's entrance into the courtroom through a side door escorted by security guards was not prejudicial).

In the absence of inherent prejudice, Defendant must show that he was actually prejudiced by his appearance. *Holbrook*, 475 U.S. at 572, 106 S. Ct. at 1347-1348. However, the record does not reflect that anyone in the courtroom called attention to Defendant's bruises, or that any member of the jury questioned Defendant's physical appearance. Nothing in the record indicates that Defendant's appearance impacted the jury's deliberations or that the result of the trial would have been or even might reasonably have been any different had the trial been continued. Based on a review of the record, we find that Defendant has failed to show that he was prejudiced by the trial court's denial of his request for a continuance.

## 5. Sentencing Issues

On August 29, 2001, the trial court held a sentencing hearing. Defendant called Ms. Beverly Douglas, an employee with Youth Villages, and his grandmother, Mrs. Juanita Watson, to testify in his behalf. Both women described Defendant as mildly retarded with attention deficit disorder. When he was about thirteen, Defendant was placed under the care of the Department of Children Services because his mother, who suffered from bipolar disorder and drug addiction, either could not or would not care for him. Defendant had no interaction with his father, who was an alcoholic. After a series of group homes, Defendant was returned to his mother in August 1999, one month before the offense, and continued to reside with her while awaiting trial. As long as Defendant took his medication, his behavior improved. However, when his mother was unable to follow the instructions for the prescribed dosages, the situation deteriorated. Both Ms. Douglas and Mrs. Watson felt that Defendant, if properly medicated, would respond to rehabilitation. Defendant did not testify or make a statement at the sentencing hearing. *See* Tenn. Code Ann. § 40-35-209.

At the time of the sentencing hearing, there were twenty-two statutory enhancement factors listed in Tennessee Code Annotated section 40-35-114. Subsequently, in Public Acts 2002, ch. 849, § 2, the legislature added a twenty-third enhancement factor, but listed it as enhancement factor (1) and renumbered previous factors (1) through (22) as (2) through (23). *See* Tenn. Code Ann. § 40-35-114 (2001 Supp.). In this opinion, we will refer to the enhancement factors of Tennessee Code Annotated section 40-35-114 as they existed at the time of the sentencing hearing.

At the conclusion of the sentencing hearing, the trial court found the following enhancement factors applicable: (1) Defendant was a leader in the commission of the crime; (2) Defendant had

a previous history of unwillingness to comply with the conditions of a sentence involving release into the community; (3) Defendant possessed a firearm during the commission of the crime; and (4) Defendant was adjudicated to have committed a delinquent act as a juvenile that would constitute a felony if committed as an adult. Tenn. Code Ann. §§ 40-35-114(2), (8), (9) and (20).

The trial court found that Defendant's youth and mental condition were not mitigating factors in determining the length of his sentencing. *See* Tenn. Code Ann. §§ 40-35-113(6) and (8). The trial court concluded that the evidence showed that the robbery was planned ahead of time that Defendant carried out the plan, and that Defendant was able to successfully execute an escape from the car lot. The trial court considered Defendant's family life as a mitigating factor, but accorded this factor no weight. *Id.* -113(13). The trial court sentenced Defendant to twenty-five years.

Defendant now challenges the trial court's determination that Defendant was a leader in the commission of this offense arguing that Mr. Joseph, not Defendant, was the leader of the group. Defendant also argues that the trial court erroneously failed to consider Defendant's youth and mental condition as well as his prior family history as mitigating factors in determining the length of Defendant's sentence. Defendant does not challenge the application of enhancement factors (8), (9) and (20).

When a defendant challenges the length of a sentence, this court conducts a de novo review of the record, with a presumption that the trial court's determinations are correct if the record shows, as it does here, that the trial judge considered the sentencing principles and all relevant facts and circumstances. Tenn. Code Ann. § 40-35-401(d); *State v. Pettus*, 986 S.W.2d 540, 543 (Tenn. 1999). The burden is on the defendant to show that the sentence is improper. Tenn. Code Ann. §40-35-401(d) Sentencing Commission Comments. In reviewing the length of the sentence, this court must consider: (1) the evidence presented at the trial and sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any appropriate enhancement and mitigating factors; and (6) any statements made by Defendant on his own behalf. Tenn. Code Ann. § 40-35-210(b).

Second degree murder is a Class A felony. As a Range I offender, Defendant is subject to a sentence of not less than fifteen years nor more than twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1). The presumptive sentence for a Class A felony is the midpoint of the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If both enhancing and mitigating factors are present, the trial court must start at the midpoint of the range, enhance the sentence within the range as appropriate for the enhancing factors, and then reduce the sentence as appropriate for the mitigating factors. Tenn. Code Ann. § 40-35-210(e).

The weight placed on one factor by the trial court may vary from that assigned to another, and the legislature has specifically declined to assign a numerical value to mitigating and enhancement factors. Sentencing Commission Comments, Tenn. Code Ann. § 40-35-210; *State v. Spratt*, 31 S.W.3d 587, 606 (Tenn. 2000). The weight accorded enhancing and mitigating factors

is within the trial court's discretion so long as the record supports its findings and the findings comply with sentencing principles. *State v. Kelly*, 34 S.W.3d 471, 479 (Tenn. Crim. App. 2000).

Turning first to the application of enhancement factor (2) to Defendant's sentence, we agree with the trial court's conclusion that the defendant was a leader in the commission of this crime. Whatever Mr. Joseph's role in the events of that afternoon, Defendant does not have to be the only leader for this enhancement factor to be applicable. *State v. Hicks*, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). Rather, the proof need show only that Defendant was a leader. *Id.* According to the testimony at trial, Defendant and the others discussed their lack of money as they drove around town. During the ride, the gun was passed to Defendant. Defendant carried the gun into Mr. Ali's office while Mr. Sweeney and Mr. Spencer occupied Mr. Amaya's attention in the car lot. When Mr. Ali refused to cooperate in Defendant's attempt to rob him, Defendant shot Mr. Ali and fled. The trial court properly considered factor (2) in determining the length of Defendant's sentence.

Defendant next argues that the trial court erred in not considering Defendant's youth and mental condition as mitigating factors in determining the length of Defendant's sentence. Tenn. Code Ann. §§ 40-35-113(6) and (8). Defendant also contends that the trial court should have assigned some weight to its consideration of Defendant's family history under factor (13). *Id.* -113(13). At the time of the crime, Defendant was sixteen years old and in the ninth grade. Ms. Douglas and Mrs. Watson testified that Defendant was mildly retarded and suffered from attention deficit disorder. Although his behavior improved with the administration of medication, Defendant's mother, because of her own drug and health related problems, was not able to give Defendant his medication as required. Defendant argues that these factors impaired his judgment and reduced his culpability for the offense. We disagree.

Defendant's youth may be considered as a mitigating factor if this factor caused a lack of substantial judgment in committing the crime. Tenn. Code Ann. § 40-35-113(6). However, Defendant's age alone is not enough to trigger application of this factor. Rather, Defendant's youth must be considered in combination with his "age, education, maturity, experience, mental capacity or development, and any other pertinent circumstance tending to demonstrate his ability or inability to appreciate the nature of his conduct." *State v. Adams*, 864 S.W.2d 31, 33 (Tenn. 1993); *State v. Carter*, 908 S.W.2d 410, 413 (Tenn. Crim. App. 1995). The trial court found that Defendant's crime was well thought out, beginning with the young men's discussions in Mr. Joseph's car concerning their plan to rob Mr. Ali and ending with Defendant's flight from the scene. Further, Defendant's prior probation violation resulting from his possession and use of a gun further illustrated Defendant's determination to own a gun. Based on the record, we find that the record supports the trial court's refusal to consider factor (6) as a mitigating factor.

While the trial court agreed that the testimony indicated that Defendant had a learning disability, it found that the evidence was insufficient to conclude that Defendant's mental condition significantly reduced Defendant's culpability for the crime. The trial court stated, "the fact that [he] might have some learning deficits [sic], slightly retarded really doesn't have, bear any relationship to this offense where there was a plan to go rob the victim that was placed into effect and Mr. White

did that and killed him. There was also a plan about cover up of the events, and it just clearly shows some sophistication in design and follow-thru [sic]." The record supports the trial court's decision not to apply factor (8) in mitigation of Defendant's sentence.

Finally, the trial court considered Defendant's unstable childhood in mitigation of his sentence but assigned this factor no weight noting that Defendant had been given ample opportunities to overcome the disadvantages of his family life. The record supports the trial court's assignment of no weight to factor (13).

Because our review indicates that the trial court considered the relevant sentencing criteria, made findings of fact that are adequately supported in the record and followed the statutory sentencing procedure, we conclude that the trial court did not abuse its discretion when it ordered Defendant to serve twenty-five years. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE